Frank C. Papa and Mary Papa v. Commissioner.
Papa v. Comm'r
Docket Nos. 3553-62, 5369-63.
United States Tax Court
T.C. Memo 1970-90; 1970 Tax Ct. Memo LEXIS 269; 29 T.C.M. (CCH) 421; T.C.M. (RIA) 70090; April 22, 1970, Filed *269 Held, that for each of the taxable years 1954, 1957, 1958 and 1959 petitioners received taxable i income which was not reported in their joint income tax returns. Amounts of such unreported income are determined on the basis of respondent's net worth plus nondeductible expenditures computations. Held, further, that at least a part of the deficiencies for 1954 and 1957 through 1959 is due to fraud. Held, further, that assessment and collection of any deficiencies or additions to tax for such years are not barred by the statute of limitations. Held, further, assessment and collection of anydeficiencies or additions to tax for the years 1955 and 1956 are barred by the statute of limitations, no fraud having been proved in those years. Carl R. Scacchetti, Jr. Executive Office Bldg., Rochester, N. Y., for the petitioners. Stephen M. Miller, for the respondent. IRWIN
Memorandum Findings of Fact and Opinion IRWIN, Judge: Respondent determined deficiencies in income tax and additions to tax for fraud under section 6653(b), I.R.C. 1954, [1] *270 against petitioners, as follows: Docket No.
Year
Deficiency
Addition to Tax Sec. 6653(b)
5369-63
1954
$12,338.98
$7,322.90
1955
5,650.15
2,825.07
1956
5,454.08
3,164.29
3553-62
[2] 1957
23,645.87
11,822.93
1958
23,711.74
11,855.87
1959
9,144.59
4,572.29
The issues for decision are: 1. Whether petitioners had additional taxable income for the taxable years 1954 through *271 1959 which they failed to report in their tax returns. 2. Whether all or part of the resulting underpayment for each year in question was due to fraud under section 6653(b). 3. Whether the statute of limitations bars assessment with respect to any of the years in question. 422 Findings of Fact The parties stipulated some facts and exhibits which are incorporated herein. Petitioners, Frank C. and Mary Papa, are husband and wife, who resided at 100 Shaftsbury Road, Rochester, N. Y., at the time of the filing of the petition involved herein. They filed joint income tax returns, which were prepared for them by an accountant, Oscar S. Block (hereinafter Block), for the taxable calendar years 1954, 1955, 1956, 1957, 1958 and 1959, with the district director of internal revenue, Buffalo, N. Y., and reported taxable income as follows: Year
Taxable Income(Loss) Reported
1954
$ 12,290.45
1955
(2,273.74)
1956
8,189.86
1957
5,551.10
1958
9,437.13
1959
18,258.06
Block began working for Frank C. Papa (hereinafter petitioner) in 1950. In addition to the preparation of petitioners' individual income tax returns, Block also prepared quarterly payroll tax returns for the Brighton Blacktop Paving Company (hereinafter *272 Brighton), of which petitioner was the sole proprietor. Information as to each employee's salary and the taxes withheld therefrom was supplied to Block by someone in petitioner's office at Brighton, probably the bookkeeper. Brighton was engaged throughout the years at issue in the construction business and in the business of resurfacing streets, roads, sidewalks and gutters. Block did not extract figures from Brighton's books or records [3] for use in preparing petitioners' income tax returns. Instead, the information regarding Brighton required for the preparation of these returns was furnished to Block by Brighton's bookkeeper on sheets of paper which listed Brighton's income and expenses. Block was kept informed by petitioner as to Brighton's expenditures for business equipment and, based on the information provided to him, Block figured the depreciation schedule on this equipment. Block received information regarding petitioners' *273 stock transactions, dividend income, and personal income and expenses directly from petitioner who kept that information recorded in a small book from which he read to Block. Block did not try to reconcile these figures. Block never audited Brighton's records during the period that he worked for petitioner, although he did prepare a "Statement of Assets and Liabilities as of Dec. 31, 1959," and a "Statement of Condition as of June 6, 1953," for petitioner. Block could not recall the purposes for which these statements were prepared. By way of background to the case now before the Court, respondent concluded an audit of petitioners' returns for the taxable years 1954 and 1955 during 1956. This audit resulted in a determination by respondent that petitioners had understated business receipts during said years in the amounts of $7,221.23 and $664.80, respectively, which determination was accepted by petitioners. A deficiency in the amount of $2,306.83 for the year 1954 was, therefore, assessed on October 23, 1956, and was paid by petitioners on November 23, 1956. The unreported business receipts for the taxable year 1955 did not result in a deficiency in tax because of the loss shown *274 on petitioners' return for that year. During 1958, respondent concluded an audit of petitioners' return for the taxable year 1956, as a result of which it was determined that petitioners had failed to report business receipts of $2,541 plus recognizable long-term capital gain of $822.50, resulting from the sale of a lot located in Rochester, which determination was accepted by petitioners. As a result, a deficiency was assessed for the year 1956 on May 9, 1958, and was paid by petitioners on May 19, 1958. Thereafter, a revenue agent of the Buffalo district, Walter Goldschmidt (hereinafter Goldschmidt), was assigned to conduct a routine audit of petitioners' returns for the calendar years 1957, 1958 and 1959. The agent first met with petitioner on August 2, 1960, at Brighton's place of business, at which time the agent requested Brighton's books and records. Petitioner's bookkeeper gave the agent a cash disbursements book and a work sheet on which job income was totaled. 423 Goldschmidt's investigation disclosed that petitioner was on a cash basis of accounting. The work sheets of income consisted of sheets of paper on which income, by job, was recorded as received. The amounts on these *275 sheets coincided with the income reported on the tax returns for the years involved. The cash disbursements book which agent Goldschmidt examined consisted of a loose-leaf binder containing sheets of paper on which were listed check disbursements for the years 1956 through 1959. However, since agent Goldschmidt was auditing only petitioners' tax returns for the years 1957 through 1959, his attention was primarily directed to those parts of the cash disbursements books listing expenditures for such years. [4]
Each year was totaled by month and each entry in the book was carried out under various headings, such as materials and supplies, repairs and maintenance, gas and oil, advertising, insurance, licenses and bonds, postage, telephone, taxes, shop supplies, personal, capital expenditures, gas and electricity, rent and miscellaneous. The total of the disbursements for the years 1957, 1958 and 1959, as shown in the cash disbursements book, coincided with the expense deductions shown *276 on petitioners' tax returns for such years. The agent never saw any books for 1954 and 1955. No other records of income or expenses were made available to the agent. Although Goldschmidt apparently saw very few invoices, his investigation revealed that all checks were allegedly drawn on the basis of invoices received and that entries of disbursements in the cash disbursements book were allegedly made from the check stubs. In examining the cash disbursements book and the check stubs, the agent noticed that some entries in the book did not match the check stubs. For example, the entry for check No. 4892, dated September 29, 1959, made payable to Davidson Granite Co. in the amount of $6,142.41 was the last entry for the month of September 1959, and this entry was carried out under the heading of "Material and Supplies." The check itself was never produced. The check stub for check No. 4892 revealed that that check was made payable to Genesee Janitor Supplies in the amount of $21.15. Check No. 3804, made payable to Davidson Granite Co. in the identical amount of $6,142.41, was listed in the cash disbursements book on August 25, 1958, and this entry was also carried out under the heading *277 of "Material and Supplies." There were other discrepancies of a similar nature for the years 1957 through 1959. The last entry in the cash disbursements book for June 1957, dated June 28, was made payable to the Davidson Granite Co. in the amount of $6,132.11. This entry was carried out to "Material and Supplies." The check number for this entry in Brighton's cash disbursements book had been altered. The first three digits were "349-." The last digit appeared to be an "8", but someone had written over the last digit making it into a "7." A review of the check stubs disclosed that check No. 3497 had been dated June 28, 1957, and was payable to Curtis Bell in the amount of $54.37. Check No. 3498 had been dated July 1, 1957, and was payable to Carl Blandino in the amount of $75. An invoice from 1956 was examined by respondent's agent. This invoice, which said, "Davidson Granite," was in the amount of $6,132.11, the same amount as the June 28, 1957, cash disbursements book entry. At the bottom of the invoice was written "check number 1900." Check No. 1900 was never located. A further discrepancy which the agent discovered in the cash disbursements book was the last entry for the month *278 of July 1957, dated July 31, 1957, which purported to be a check, No. 2106, made payable to Whitmore, Rauber and Vicinus in the amount of $5,267.92 for "Material and Supplies." The check was never located. The check stub indicated that check No. 2106, dated August 1, 1957, was made payable to Carl Blandino in the amount of $75. The agent discovered, upon examination of the cash disbursements records for the prior year, 1956, a check listed as check No. 1834 in the same amount of $5,267.92 payable to Whitmore, Rauber and Vicinus. [5] Another discrepancy discovered in the cash disbursements book was the last entry for *279 April 1959, dated April 30, 1959, which was listed as check No. 4088, payable to 424 Rochester Plumbing Co. in the amount of $2,000. This entry was carried under "Material and Supplies." This check was never located. According to the check stub, check No. 4088 had been made payable on May 1, 1959, to the Rochester Telephone Corp. in the amount of $54.60. A discrepancy was discovered regarding the entry in the cash disbursements book for May 12, 1959. Although the entry was dated May 12, it was the last entry for that month and followed entries dated later than May 12, 1959. The entry purported to be a check No. 855, made payable to the General Electric Appliance Co. in the amount of $1,219.85 and listed under "Material and Supplies." This check was never produced. However, check No. 3785 dated July 10, 1958, was entered in the cash disbursements book for 1958. This check, in the same amount, $1,219.85, was made payable to the General Electric Appliance Co. and was listed under "Material and Supplies." In several other instances, no checks supporting entries in the cash disbursements book were found. According to the cash disbursements book, check No. 3662, dated May 20, 1958, was payable *280 to Whitmore, Rauber and Vicinus in the amount of $913.66; check No. 3802, dated August 25, 1958, was payable to Ryan Stone Co. in the amount of $192.50; and check No. 3807 of the same date, was payable to Rochester Asphalt Materials in the amount of $408.30. These three checks were listed under "Material and Supplies." As a result of the inaccuracies and discrepancies in Brighton's books, agent Goldschmidt recommended the matter to the Intelligence Division for a possible fraud investigation of petitioners for the years 1957 through 1959. Goldschmidt returned to Brighton's place of business in late August 1960 with special agent Milton M. Offen (hereinafter Offen). Thereafter, agent Offen conducted the fraud investigation with the assistance of agent Goldschmidt. Offen discovered the same discrepancies which Goldschmidt had found and, in addition, found another discrepancy - check No. 873, dated July 21, 1959, was payable to the Redman Concrete Co. in the amount of $2,886.09. This entry was listed under "Material and Supplies," but the check itself was never found. Although the check was the last entry for July 1959, it was preceded by entries dated July 24, July 27, July 28, and July *281 30. Agent Offen tried to confirm whether any of these disbursements listed in Brighton's books, for which no canceled checks had been produced, had in fact been paid to the alleged payees. All of the alleged payees were contacted as to whether they had received payments during the time claimed by petitioner for the amounts entered in the cash disbursements book. This inquiry disclosed that none of the claimed payments had been made at the times recorded in the cash disbursements book. On February 16, 1962, petitioners were served with a valid notice, in compliance with section 7605(b) [6] that respondent deemed it necessary to make a reinvestigation of their books and records for the taxable years 1954-1956. The agents were informed, upon requesting these records, that no Brighton records for the years 1954 through 1956 were available because they had been destroyed. [7] *282 Due to the inaccuracies and discrepancies in Brighton's books, the agents resorted to the net worth plus nondeductible expenditures method of reconstructing petitioners' income for the years 1954 through 1959. The statutory notice of deficiency covering the taxable years 1954 through 1956 was mailed, by certified mail, to petitioners at their last known address on September 16, 1963. Petitioners executed valid consents extending the period for assessment with respect to the taxable years 1957 and 1958 to June 30, 1963. On June 22, 1962, respondent made jeopardy *283 assessments with 425 respect to their taxable years 1957, 1958 and 1959, as follows: Year
Deficiency
Addition to Tax Sec. 6653(b)
1957
$13,367.76
$6,683.88
1958
10,997.16
5,498.58
1959
6,158.04
3,079.02
On August 17, 1962, a statutory notice of deficiency with respect to the taxable years 1957, 1958 and 1959 was mailed, by certified mail, to petitioners at their last known address. In the statutory notice for the years 1957, 1958 and 1959, respondent erroneously subtracted as "technical adjustments" from this net worth reconstruction the following items: 1957
1958
1959
Business Checks Cashed
$ 3,900.00
$ 1,067.08
$5,008.00
Real Estate Improvements
12,716.04
20,657.47
1,082.92
Medical Expense Adjustment
(343.10)
New York State Taxes Paid
736.57
225.27
Interest Paid on Federal Income Tax 53.04
$17,352.61
$21,777.59
$5,973.09 $17,352.61 $21,777.59 $5,973.09 As a result, the statutory notice for said years understated the reconstructed income by such amounts and was increased accordingly by respondent in an amendment to his answer. Petitioners have stipulated that these items were erroneously subtracted from the net worth reconstruction. See footnote 2, supra. The following is the computation of additional increases *284 in petitioners' income as of December 31 for each of the taxable years 1954 through 1959, as reconstructed by respondent through the use of the net worth plus nondeductible expenditures method. The items that are asterisked (*) are in dispute whereas the remaining items listed have been stipulated by the parties. In addition, petitioners have contended that there are some other adjustments that should be made to this net worth plus expenditures reconstruction, such as the listing of a garage, deeded to petitioner by his father as a gift, as an asset and the listing of certain payroll taxes as a liability for each of the years at issue. ASSETS
12-31-53
12-31-54
12-31-55
12-31-56
1. Cash on hand * (checks received but not deposited at year's end)
--
--
$25,848.49
$23,061.70
2. Bank accounts (Rochester, N.Y., unless otherwise indicated)
a) Genesee Valley Union Trust
a/c Frank & Mary Papa (checking)
$1,064.21
$3,430.88
52.47
225.43
a/c Brighton Blacktop Paving (checking)
1,420.58
3,069.11
b) Lincoln Rochester Trust
a/c Brighton Blacktop Paving (checking)
7,038.79
16,419.62
1,311.04
1,574.53
c) Rochester Savings Bank
a/c F81592 Frank C. & Mary Papa
11,528.74
11,789.58
12,086.14
12,405.48
a/c 161540 Frank C. & Mary Papa
1,952.94
1,997.11
2,648.60
2,718.56
3. Certified checks due from City of Rochester, N.Y. * (issued 12/56)
2,700.00
4. Stocks
6,348.04
11,358.34
15,290.69
29,296.13
5. Receivable (Spezio Const. Co.)
11,000.00
6. Vehicles & Equipment, * Brighton Black- top Paving (cost per returns)
19,516.42
38,775.57
27,889.73
43,737.75
7. Real Estate (Rochester, N.Y., unless indicated)
a) 100 Shaftsbury Rd. (residence) *
40,000.00
40,000.00
40,000.00
40,000.00
b) Bay St.-Longview
3,855.00
3,855.00
3,855.00
c) 200 Peck St. (restaurant)
4,500.00
4,500.00
4,500.00
8. Work in process --
--
--
[8] *285 13,430.47
TOTAL ASSETS
$91,304.14
$132,126.10
$145,902.74
$176,719.16 426 LIABILITIES
12-31-53
12-31-54
12-31-55
12-31-56
9. Reserve for depreciation, vehicles & equipment, * Brighton Blacktop paving (per returns) $ 6,374.07
$ 11,765.58
$ 12,749.52
$ 20,371.71
TOTAL LIABILITIES
$ 6,374.07
$ 11,765.58
$ 12,749.52
$ 20,371.71
Net Worth - end of year $84,930.07 $120,360.52
$133,153.22
$156,347.45
Net Worth - beginning of year 84,930.07
120,360.52
133,153.22
Increase in Net Worth $ 35,430.45
$ 12,792.70
$ 23,194.23
ADDITIONS:
Living Expenses *
$ 13,080.62
$ 13,542.35
$ 11,033.84
SUBTRACTIONS:
50 percent of long-term capital gain
422.17
1,733.28
3,827.86
Dividend exclusion 50.00
50.00
100.00
Corrected Adjusted Gross Income
$ 48,038.90
$ 24,551.77
$ 30,300.21
Less: Deductions from Adjusted Gross
Income (per tax returns) 1,000.00
2,077.43
[9] *286 1,574.75
$ 47,038.90
$ 22,474.34
$ 28,725.46
Less: Exemptions (3) 1,800.00
1,800.00
1,800.00
Taxable income - corrected
$ 45,238.90
$ 20,674.34
$ 26,925.46
Taxable income - per return 12,290.45
(2,273.74)
8,189.86
Additional income $ 32,948.45
$ 22,948.08
$ 18,735.60
ASSETS
12-31-57
12-31-58
12-31-59
1. Cash on hand * (checks received but not deposited at year's end)
$ 14,547.91
2. Bank accounts (Rochester, N.Y., unless otherwise indicated)
a) Genesee Valley Union Trust
a/c Frank & Mary papa (checking)
$ 598.52
$ 221.43
77.29
a/c Brighton Blacktop Paving (checking)
3,933.43
7,522.57
809.83
b) Lincoln Rochester Trust
a/c Brighton Blacktop Paving (checking)
3,515.49
12,565.94
3,424.43
c) Central Trust
a/c Brighton Blacktop Paving (checking)
1,144.75
397.64
a/c Frank C. Papa (savings)
25,523.43
26,162.61
26,435.18
d) Rochester Savings Bank
a/c F81592 Frank C. & Mary Papa
12,780.42
13,166.70
3,419.80
a/c 161540 Frank C. & Mary Papa
6,068.48
333.49
344.00
e) First National Bank, Hollywood, Fla.
a/c 21222 Frank C. & Mary Papa (savings)
10.00
3. Stocks
59,667.64
69,568.73
133,699.00
4. Brokerage Account, Bache & Co. (credit balances)
1,910.04
218.82
5. Receivables
a) Mortgages, Oliver St. and Rowley St. realty
15,000.00
b) Loans - United Roller (Charles Gagliano)
3,805.76
3,805.76
--
c) Loan - Leonard D'Alezio
1,559.32
1,054.98
d) Due from E.O. Provenzano, Atty., realty sales proceeds
3,937.66
*287 427 12-31-57
12-31-58
12-31-59
6. Vehicles & equipment, * Brighton Blacktop
[10] *288 *289 *290 *291 $ 37,954.97
[10] $ 34,934.16
$ 36,731.49
paving (cost per returns)
7. Real Estate (Rochester, N. Y., unless indicated)
a) 100 Shaftsbury Rd. (residence) *
40,000.00
40,000.00
40,000.00
b) Swimming pool (on residence)
1,000.00
1,145.00
1,145.00
c) 200 Peck St. (restaurant)
4,500.00
4,500.00
4,500.00
d) 3 Rowley St.
21,851.37
22,675.37
e) 67 Oliver St.
41,636.17
f) Baird Road tract, Penfield, N. Y.
40,000.00
g) 47 Jewel St. (Foreclosure sale deposit)
350.00
TOTAL ASSETS
$221,199.51
$282,852.04
$326,103.03
LIABILITIES
8. Mortgages Payable
a) 67 Oliver St. - Lincoln Rochester Trust
$ 4,300.00
b) 67 Oliver St. - Marie Priceland
4,508.54
c) Baird Road tract, Penfield, N. Y.
$ 28,000.00
9. Reserve for depreciation, Rowley & Oliver Sts. property
1,959.71
10. Reserve for depreciation, vehicles & equipment, * Brighton Blacktop Paving (per returns)
[10] $ 19,893.23
19,795.91
19,395.28
TOTAL LIABILITIES
$ 19,893.23
$ 30,564.16
$ 47,395.28
Net Worth - end of year
$201,306.28
$252,287.88
$278,707.75
Net Worth - beginning of year 156,347.45
201,306.28
252,287.88
Increase in Net Worth
$ 44,958.83
$ 50,981.60
$ 26,419.87
ADDITIONS:
Living expenses * (personal expenditures by checks)
15,327.84
12,602.22
20,507.67
Capital loss in excess of $1,000
660.57
SUBTRACTIONS:
50 percent of long-term capital gain
314.44
4,451.96
Capital loss carryover
660.57
Dividend exclusion 100.00
100.00
100.00
Corrected adjusted gross income
$60,847.24
$62,508.81
$42,375.58
Less: Deductions (per tax returns) 1,700.29
1,668.47
1,965.25
Net Income
$59,146.95
$60,840.34
$40,410.33
Less: Exemptions (3) 1,800.00
1,800.00
1,800.00
Taxable income - corrected
$57,346.95
$59,040.34
$38,610.33
Less taxable income per return 5,551.10
9,437.13
18,258.06
Balance
$51,795.85
$49,603.21
$20,352.27
On December 10, 1956, and December 12, 1956, petitioner drew two checks, Nos. 3153 and 3158, in the respective amounts of $2,000 and $700 on Brighton's account in the Lincoln Rochester Trust Co., payable to the City of Rochester. These checks were submitted to the City in connection with a contract bid, and were posted in lieu of a performance bond. The City returned these checks to petitioner in January 1957 and he deposited them (together with another check in the amount of $15,422.08) on January 21, 1957, to the account from which they *292 were drawn. 429 The City of Rochester drew a check on December 21, 1956, on its account in the Central Trust Company payable to Brighton in the amount of $23,061.70. Petitioner deposited this check in Brighton's account in the Lincoln Rochester Trust Co. on January 9, 1957. During 1957, petitioner commenced construction of a swimming pool in the back yard of his residence at 100 Shaftsbury Road. He spent $1,000 during 1957 and $145 during 1958 on this project. The cost of the labor and materials was charged as business expenses on Brighton's books. Petitioner drew a check on October 23, 1957, in the amount of $800 which was payable to Thomas Nanna. The check was listed in Brigton's cash disbursements book as a payment for materials and supplies. The $800 was expended for the purchase of a ring from Thomas Nanna who was an undertaker. Petitioner purchased, on May 27, 1957, real property located at 3 Rowley Street, Rochester, N. Y., for $5,750. On February 14, 1958, petitioner purchased real property located at 67 Oliver Street, Rochester, N. Y., for $17,750 assuming a first mortgage in the amount of $4,900 held by the Lincoln Rochester Trust Co. and giving a second mortgage in the *293 amount of $5,000 to the seller of the property, Marie Priceland. Petitioner owed the Lincoln Rochester Trust Co. $4,300 on the first mortgage and owed Marie Priceland $4,508.54 on the second mortgage as of December 31, 1958. Petitioner made improvements to these properties during 1957, 1958 and 1959 in the total amounts of $16,101.37, $24,710.17 and $1,082.92, respectively. Of these total amounts, $12,716.04, $20,657.47 and $1,082.92, respectively, were charged on Brighton's books as "Material and Supplies," and were deducted on petitioner's returns for those respective years. Petitioner capitalized these same expenditures and deducted depreciation thereon in his income tax returns for 1958 and 1959. Of the $1,082.92 expenditure deducted by petitioner in 1959, only $395 thereof was capitalized by petitioner in 1959. On December 21, 1959, petitioner sold these properties to Ernest and Ethel Andrews for a total purchase price of $75,000. As of December 31, 1959, they owed petitioner $15,000 in connection with this transaction. As of December 31, 1959, petitioner held undeposited checks in the total amount of $14,547.91 and his attorney, Edward Provenzano, held $3,937.66 for petitioner's *294 account, all in connection with the sale. Petitioner loaned the United Roller Mfg. Co. $7,099.26 between March 27 and April 15, 1957. As a result of repayments during 1957 totaling $3,293.50, the balance due petitioner as of December 31, 1957, was $3,805.76. Petitioner received a third mortgage on property located at 47 Jewell Street, Rochester, N. Y., as security for this loan. No further payments were received, and in 1959 the second mortgagee foreclosed on the property. Petitioner bid at the foreclosure sale in order to protect his security and put up a deposit of $350. On January 4, 1960, the transaction was concluded by the recording of the deed, the assumption of the mortgage, and the payment by check of the balance due on the sale. On October 18, 1958, petitioner loaned $1,600 to Leonard J. D'Alesio. As of December 31, 1958, and December 31, 1959, the balances due on this loan were $1,559.32 and $1,054.98, respectively. Petitioner's residence at 100 Shaftsbury Road, Rochester, N. Y., was valued in respondent's opening net worth at $40,000. Various financial statements submitted by petitioner to bonding companies from 1952 to 1959 revealed that petitioner listed the 100 Shaftsbury *295 Road residence at a "forced sale value" of $40,000. Petitioner kept no records pertaining to the cost of the house. Petitioner listed cash on hand on these same financial statements as follows: Financial Statement as of
Cash onHand
April 17, 1952
$ 300.00
June 6, 1953
1,905.00
March 31, 1954
1,850.00
October 15, 1954
1,904.00
December 31, 1955
3,050.00
December 31, 1957
2,500.00
June 1, 1958
2,910.27
May 15, 1959
-0-
December 31, 1959
-0-
On December 23, 1959, petitioner purchased real property on Baird Road, Penfield, N. Y., for $40,000. He paid $12,000 down and gave the seller a mortgage in the amount of $28,000. No payments were made on this mortgage during the remainder of 1959. Petitioner had deducted as business expenses in 1959 approximately $800 in checks written on Brighton's accounts which had related to a party celebrating the wedding anniversary of petitioner's parents. Petitioner was reimbursed for part of this amount, but did not include any part of the reimbursement in his gross income. Although petitioner did report some dividend income, he failed to report the receipt 430 of dividends in the amounts of $200, $225 and $1,110 in the years 1957, 1958 and 1959, respectively. Petitioner did *296 not report any interest income on his tax returns for the years 1954 through 1959, although he received the following interest on his various bank accounts and receivables: Year
Amount
1954
$ 305.01
1955
348.05
1956
389.30
1957
1,060.69
1958
1,043.22
1959
1,051.42
Petitioner quit school in 1923 at the age of 14 in order to help support his family by working in the contracting business with his father. Since the contracting business was more active during the summer, petitioner also worked as an errand boy during the winter, earning from $12 to $20 per week. He married in 1929, at which time he went into business for himself. In 1956, petitioners made a trip to California in an effort to better themselves financially. However, they did not remain there, but rather returned to Rochester within a very short time. Petitioner never filed income tax returns in any district other than the Buffalo district. He did not file any returns there for the years 1930 through 1940. For the years 1941 through 1953, petitioner filed tax returns with the Buffalo district listing his tax liabilities. The returns for these years were not available. Prior to the years in question, petitioner's father had deeded him a *297 garage located on Hebard Street, Rochester, as a gift which he owned throughout the years in question. Respondent's agent tried to estimate the amount of money which petitioners could have accumulated during the years 1930 through 1953. He obtained "Certificates of Assessments and Payments" for those years from the district director of the Buffalo district. The only information contained in these certificates was whether petitioners filed tax returns for the years 1930 through 1953 and the amount of tax, if any, they paid. Based on the tax rates in effect in those years, the number of exemptions, the amount of taxes paid by petitioners, and the maximum earnings a person could make without being required to file a tax return, the agent estimated the probable income which petitioners earned for each of the years 1930-1953. He also estimated petitioners' living expenses for that period, and arrived at the conclusion that petitioners would have been able to accumulate no more than $23,754.97 in cash during those years. His computation was made as follows: Estimated adjusted gross income:
1930-1953
$80,650.00
Estimated living expenses:
1930-1953 53,500.00
Balance
$27,150.00
Federal taxes paid:
1930-1953 3,395.03
Possible cash accumulation:
1930-1953
$23,754.97
Respondent *298 added the proceeds from certain transactions occurring prior to the years at issue (see pages 22 and 23) to the possible cash accumulation figure of $23,754.97, thereby arriving at a total possible cash accumulation from 1930 through 1953 of $68,000. In order to reconstruct petitioners' personal expenses, respondent's agent analyzed Brighton's three checking accounts at the Genesee Valley Union Trust Company, the Central Trust Company, and the Lincoln Rochester Trust Company in order to determine the nature of its disbursements in 1957, 1958 and 1959. Every check which was made available was listed by date, check number, amount, and payee. Petitioner's bookkeeper discussed the nature of each disbursement with respondent's agent, who was thereby able to make a determination as to whether the expenditure was personal or not. Any item listed under "Personal" which related to the acquisition of an asset otherwise described in respondent's net worth statement was omitted from the agent's computation of petitioners' personal expenses during 1957 through 1959. The total amounts drawn upon Brighton's three checking accounts which were personal expenses were $11,743.93, $6,390.23 and $14,711.98 *299 for the years 1957, 1958 and 1959, respectively. No checks for Brighton's accounts were available for the years 1954, 1955 and 1956. Respondent estimated that petitioner drew business checks for his personal expenses in the amounts of $5,000, $6,000 and $7,000 for the years 1954, 1955 and 1956, respectively. These amounts were included in the net worth computation as personal living expenses. The joint checking account of Frank and Mary Papa at the Genesee Valley Union Trust Company was used only for personal expenditures. The checks written on this account had been destroyed and 431 no photocopies were available from the bank. Respondent obtained copies of the ledger sheets of this account, added the deposits made during each of the years in question to the opening balance for that year, and then subtracted the ending balance, thereby obtaining the total amount of the checks drawn on this account which were personal, and these amounts were added to the amounts previously determined to be personal expenses drawn on the business accounts. Ultimate Findings 1. Petitioners' income for each of the years 1954, 1957, 1958 and 1959 was substantially understated. 2. Petitioners received no *300 income from nontaxable sources during the years at issue. 3. For each of the years 1954, 1957, 1958 and 1959, a part of the understatement of tax by petitioners was due to fraud. 4. Assessments of income tax deficiencies and additions to tax against petitioners for the years 1954, and 1957 through 1959 are not barred by the statute of limitations. Assessment of income tax deficiencies and additions to tax against petitioners for the years 1955 and 1956 are barred by the statute of limitations. Opinion Petitioners filed a timely petition for review of respondent's deficiency determinations with additions to tax for fraud for the years 1954 through 1959. Respondent, through the use of the net worth plus personal expenditures method, computed petitioners' net income for the years in question. Such computation showed amounts of net income in each of those years in excess of the amounts reported by petitioners in their income tax returns for those years. Statute of Limitations Since the statutory notice of deficiency covering the taxable years 1954, 1955 and 1956 was mailed to petitioners on September 16, 1963, assessment and collection of the alleged deficiencies for those years are barred *301 by the statute of limitations, section 6501(a), unless respondent proves that petitioners filed false or fraudulent returns for those years, with the intent of evading taxes. Section 6501(c)(1). We hold that respondent has succceeded in proving that petitioners filed a false or fraudulent return for the year 1954, with the intent of evading tax. Therefore, the taxable year 1954 is not barred by the statute of limitations. However, as to the years 1955 and 1956, respondent has failed to sustain his burden as to fraud, and we hold, therefore, that those two years are barred by the statute of limitations. Our reason underlying these conclusions will be set forth in detail in our discussion of the fraud issue. As for the years 1957 and 1958, petitioners entered into valid agreements extending the statute of limitations to June 30, 1963. Jeopardy assessments were made for the years 1957 through 1959 on June 22, 1962, and the statutory notice of deficiency for those three years was mailed to petitioners on August 17, 1962. Therefore, it is evident, and we hold, that there is no bar created by the statute of limitations for the years 1957, 1958 and 1959. The Fraud Issue 1. In General In *302 order to sustain his burden of proof as to fraud, respondent must present clear and convincing evidence that some part of the deficiency for each of the years involved was due to fraud with the specific intent of evading tax. Section 7454(a); Charles E. Mitchell, 32 B.T.A. 1093 (1935), affd. 303 U.S. 391 (1938); Arlette Coat Co., 14 T.C. 751 (1950). Despite the fact that respondent is not required to prove the precise amount of the deficiencies as a part of his burden of proving fraud, he must at least prove that some part of the deficiency for each of the years at issue was due to fraud. W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). We are mindful that the fraud issue is a factual question which can be resolved only after a thorough examination of all the facts and circumstances presented to us. In deciding whether respondent has established fraud, we may consider the entire record properly before us and are not limited to respondent's affirmative evidence on the fraud issue. Wallace H. Petit, 10 T.C. 1253 (1948); L. Schepp Company, 25 B.T.A. 419 (1932). 432 2. Taxable Year 1954 As to the fraud issue for the year 1954, petitioners stipulated that $16,578.49 *303 was received in September 1954 for work performed on a project called the Mt. Hope City Job and $15,020.22 in June 1954 for work performed on a project known as Monticello Drive, neither of which amounts was reported by petitioners on their 1954 income tax return. This failure to report a total of $31,598.71 in business receipts in 1954 is strong evidence of fraud in that year. Greenfeld v. Commissioner, 165 F. 2d 318 (C.A. 4, 1957). Petitioner offered no explanation as to why he failed to report such a substantial amount of money. The total business receipts of Brighton for 1954 were listed by petitioners on their income tax return for that year as $113,955.91. By stipulation, petitioners have agreed they understated their income as above stated. This amounts to an understatement of 22 percent. In addition, although we do not know the circumstances involved in respondent's earlier determination made in 1956, which petitioners accepted, that they failed to report $7,221.23 in business receipts in 1954, this is still a factor to be considered by us in our decision as to fraud in that year. Petitioners' failure to report any interest from bank accounts and receivables in 1954 is another *304 factor in our determination of fraud. Interest for that year totaled $305.01. Petitioners argued as to this and all other years involved that he had no direct knowledge of anything relating to the books kept by his bookkeeper, and that, therefore, any omissions of income or overstatements of expenses therein were not his responsibility. Nevertheless, we find it difficult to conceive of any possible reason why petitioner's bookkeeper should conceal $31,598.71 in business receipts and $305.01 in interest income in 1954. In any event, it hardly seems conceivable that petitioner could have been unaware that a total of $31,903.72 in business receipts was not reported ported at a time when the total reported was just under $114,000. Block, who prepared petitioners' returns for 1954 as well as the other years in question, did so based on information supplied by either petitioner or his bookkeeper. Block was furnished information regarding Brighton on a sheet of paper which listed income and expenses by both monthly and annual totals. Other than the preparation of two financial statements for petitioner, Block never had access to petitioners' check books, canceled checks, or cash disbursements *305 book. Block's role was not such as to relieve petitioners of responsibility regarding the information reported on petitioners' returns. We have surveyed petitioner's whole course of conduct and have been able to adduce from all the evidence of record and inferences properly to be drawn therefrom that, and we hold, at least some part of the deficiency for 1954 was due to fraud. 3. Taxable Years 1955 and 1956 We now turn to the years 1955 and 1956 in which assessment and collection of any deficiencies and additions to tax are barred by the statute of limitations unless respondent has proved fraud by clear and convincing evidence. Should these years be opened by our finding of fraud, the correctness of the deficiency determined by respondent, viz., the net worth statement, will be presumed. W.A. Shaw, supra; Leonard B. Willits, 36 B.T.A. 294 (1937). Respondent in an effort to prove fraud emphasized a pattern of substantial understatements of income over the six-year period at issue. For the years 1955 and 1956, petitioners again failed to report any interest income. It was stipulated that they received such income in the amounts of $348.05 for 1955 and $389.30 for 1956. Respondent offered *306 no other affirmative proof of any substantial deficiencies in these two years. Instead he computed alleged understatements of income by the use of the net worth plus nondeductible expenditures method. Respondent offered little affirmative proof of substantial understatements of income in 1955 and 1956 but relied on the presumption of correctness attaching to his net worth statement in order to establish that petitioners substantially understated their taxable income for these years. The only specific omissions of income indicated by respondent are small and not meaningful in establishing fraud in those years. In view of the fact that we find no other independent evidence regarding the years 1955 and 1956 from which fraudulent intent can be properly inferred, and bearing in mind that charges of fraud are not to be sustained lightly but must be established by clear and convincing evidence, we find that 433respondent has not established a pattern of clear, consistent and substantial understatements of income. We find no proof in those years of "bad faith, intentional wrongdoing, and a sinister motive" on the part of petitioners, which factors are the usual indicia of fraud. L. Glenn Switzer, 20 T.C. 759 (1953). *307 We are, therefore, constrained to conclude that respondent for the years 1955 and 1956 has failed to carry his burden in establishing fraud. 4. Taxable Years 1957 through 1959 Petitioners had the burden of proving erroneous the deficiencies and respondent's net worth reconstruction for the years 1957, 1958 and 1959, which years are not barred by the statute of limitations. Petitioners have stipulated that respondent erroneously subtracted certain "technical adjustments" from his net worth reconstruction. In view of this stipulation, we do not feel that respondent was obliged to prove why these items should not have been subtracted. The net worth computation for 1957 through 1959 was reasonably accurate, and, as will become clear in our discussion of the net worth reconstruction (see pages 47 through 62, infra), petitioners have not proved the items in the reconstruction erroneous. Petitioners relied upon the existence of a cash hoard as the source of any net worth increases during the years in question. They denied ever having received any income from nontaxable sources, except for the gift of a garage owned continuously by petitioners throughout the years at issue. [11] As an alternative *308 to proof of a "likely source" for the proved increases in a net worth case, the government would succeed should all possible sources of nontaxable income be negatived. [12] *309 United States v. Massei, 355 U.S. 595 (1958). We believe that the Commissioner has succeeded in negativing the existence of a cash hoard as the source of unreported increases in petitioners' net worth. (See our discussion of cash on hand pp. 49-54. Since petitioner disclaimed any nontaxable sources, other than a cash hoard and the gift of a garage, there was no burden on respondent to negate any other nontaxable sources. Commissioner v. Thomas, 261 F. 2d 643 (C.A. 1, 1958); Albert N. Shahadi, 29 T.C. 1157 (1958), affd. 266 F. 2d 495 (C.A. 3, 1959), certiorari denied 361 U.S. 874 (1959). We find, therefore, that petitioners understated their income for 1957, 1958 and 1959 in the amounts shown by respondent in his net worth plus nondeductible expenditures reconstruction for those years. Respondent has proved by clear and convincing evidence that some part of the deficiencies in tax for 1957, 1958 and 1959 are due to fraud. We will now discuss those circumstances indicative of fraud in those years. Brighton's cash disbursements records for 1956, although available to agent Goldschmidt during his routine audit of the years 1957 through 1959, had been destroyed sometime between the time that Goldschmidt completed his routine audit in August 1960 and returned approximately one week later on August 30, 1960, with special agent Offen in order to conduct a fraud investigation. [13] The haste with which petitioner proceeded to destroy those records certainly weighs heavily against him on the issue of fraudulent intent. In addition, petitioners failed to report any inteerst income and some *310 dividend income for the years 1957 through 1959. There are still other events from which we can infer fraudulent intent on the part of petitioners in 1957, 1958, and 1959. Petitioner deducted as business expenses, in 1959, approximately $800 in checks written on Brighton's accounts which had related to a party celebrating the wedding anniversary of his parents. Moreover, another check in the amount of $800 was drawn on October 23, 1957, to Thomas Nanna, an undertaker. The check was listed in Brighton's records as a payment for materials and supplies. Petitioner admitted to respondent's agents and in his testimony at trial that the check was for the purchase of a diamond ring. Five entries in Brighton's cash disbursements book for the years 1957 through 1959 434 were found to be fictitious because double deductions for "Material and Supplies" expenditures, totaling $20,762.29 were discovered by respondent's agents in Brighton's cash disbursements books. The check stubs revealed that the five checks allegedly written for these business expenses were actually made payable to other persons in the total amount of $225.75. The entries in the cash disbursements books were the last entries *311 for the respective months, even though, in some instances, they were preceded by entries that were dated later in the month involved. Although all payments were allegedly made only from invoices, there were no invoices available for the five fictitious entries. The five fictitious entries were as follows: Date
Check #
Amount
Payee
Paid and Deducted in Prior Year
6-28-57
3498 or * 3497
$ 6,132.11
Davidson Granite
Yes
7-31-57
2106
5,267.92
Whitmore, Rauber & Vicinus
Yes
4-30-59
4088
2,000.00
Rochester Plumbing
Yes
5-12-59
855
1,219.85
General Electric
Yes
9-29-59
4892 6,142.41
Davidson Granite
Yes
$20,762.29
Four other entries in the cash disbursements book, the checks for which were never found, were fictitious because agent Offen, in attempting to confirm whether any of the questionable disbursements listed in Brighton's books had in fact been paid, contacted the alleged payees who denied receipt of the alleged payments. These four entries were as follows:
Date
Check No.
Amount
Payee
Paid and Deducted in Prior Year
5-20-58
3662
$ 913.66
Whitmore, Rauber & Vicinus
No
8-25-58
3807
408.30
Rochester Asphalt
No
8-25-58
3802
192.50
Ryan Stone Co.
No
7-21-59
873 2,886.09
Redman Concrete Co.
No
$4,400.55
*312 Disbursements listed in Brighton's books for 1957 through 1959 were deducted on petitioners' tax returns for those years as business expenses. However, business deductions in the amounts of at least $11,743.93, $6,390.23 and $14,711.98, for the years 1957, 1958 and 1959, respectively, represented personal living expenses of the petitioners. Petitioner purchased various real estate in 1957, spent $41,894.46 in remodeling the structures, and then charged $34,456.43 of said amount as a business expense on Brighton's books and deducted it on his tax returns over the period 1957 through 1959. He then capitalized $33,768.51 of said amount and claimed depreciation thereon in his tax returns, so that he received double deductions. After having examined petitioners' whole course of conduct and, in particular the circumstances set forth above, we hold that at least some part of the deficiencies for 1957, 1958 and 1959 were due to fraud. The Net Worth Computations and the Underlying Deficiencies We now turn to the deficiencies asserted by respondent and note that the burden of proof with respect to these deficiencies is entirely on petitioners, as contrasted with respondent's burden of proof *313 on the issue of fraud. [14]
As to respondent's determination of petitioners' additional income during all the years in question through the use of the net worth plus nondeductible expenditures reconstruction, it is noteworthy that petitioners did not challenge the use of this method of reconstruction of their income. Rather, they contested certain items 435 contained in respondent's computations and objected to respondent's failure to include certain other items. Respondent's net worth reconstruction must be a fair and rational measure of income, as to the items involved, in light of normal business experience. Agnellino v. Commissioner 302 F. 2d 797 (C.A. 3, 1962). It is essential in net worth cases to establish with reasonable certainty the opening net worth, which will serve as a starting point from which to calculate future increases in a taxpayer's assets. Holland v. United States, 348 U.S. 121 (1954). Petitioners have stipulated to all but the following items in respondent's net worth *314 reconstruction: opening cash on hand; vehicles and equipment; work in process; reserve for depreciation; value of petitioners' residence at 100 Shaftsbury Road; personal living expenses of petitioners. As to these items, it is noted that the source of the figures used by respondent for work in process, vehicles and equipment and the reserve for depreciation for vehicles and equipment was petitioners' tax returns. There are errors which were made in transposing the figures from the returns to the net worth statement for vehicles and equipment and the reserve for depreciation with respect thereto. However, as pointed out in footnote 10, supra, we have corrected these errors which were slight and were for the most part, in petitioners' favor. It was entirely reasonable of respondent to use the very figures which petitioners had reported on their tax returns in his net worth statement in view of the fact that respondent was hampered with a total lack of, or inaccurate or incomplete, records. Petitioners have not shown these figures to be inaccurate and we find no reason to doubt the validity of these items as they were listed on their income tax returns. 1. Cash on Hand Respondent did *315 not give petitioners credit for any opening cash on hand, other than money in petitioners' bank accounts. Petitioners have asserted the now familiar theory that they had a cash hoard as of January 1, 1954, which cash hoard explains the apparent substantial increase in their net worth for that year and subsequent years. They did not testify as to the actual amount of cash they had on hand as of January 1, 1954. However, on brief, they asserted that it was more than $90,000. It is noteworthy that despite petitioners' claim of approximately $90,000 cash on hand as of December 31, 1953, petitioner submitted various financial statements in connection with the application for performance bonds or liquor licenses on which cash on hand was listed as follows: Statement of Assets as of
Cash on Hand
April 17, 1952
$ 300.00
June 6, 1953
1,905.00
March 31, 1954
1,850.00
October 15, 1954
1,904.00
December 31, 1955
3,050.00
December 31, 1957
2,500.00
June 1, 1958
2,910.27
May 15, 1959
None
December 31, 1959
None
Respondent's agent Offen testified at great length as to why petitioners were not credited with any undeposited cash on hand as of January 1, 1954. In an effort to determine petitioners' income, he checked certificates *316 of assessments and payments covering petitioners' taxable years 1930 through 1953. This disclosed that no returns were filed by petitioners from 1930 to 1940. Based on the tax rates in effect in those years, the agent listed the maximum earnings which petitioners could have had without incurring any tax liability. Petitioners' living expenses were estimated to be relatively small during those years in view of the fact that petitioners had just married in 1929 and had then gone into business for themselves in that same year. Petitioner's wife had also told respondent's agent that they were just able to make a living in 1929. The estimated living expenses were then deducted from petitioners' estimated income in order to arrive at the total amount that petitioners could have saved. The low estimate for petitioners' living expenses worked in their favor since it indicated that they could have accumulated a larger amount of cash during the years 1930 through 1940. The estimated living expenses for that period were $19,500. Agent Offen's investigation further revealed that petitioners filed returns from 1941 through 1953. Based on the amount of taxes paid and on the tax rates in effect for *317 those years, respondent's agent again estimated petitioners' income and living expenses. The living expenses totaled $34,000 for that period. Respondent's agent referred to the reconstructed estimated income of petitioners during the period 1930-1953 as their "estimated adjusted gross income." That term 436 appears to represent that amount of income remaining after business deductions, but before any deductions for dependents. The total "estimated adjusted gross income" for the period 1930-1953 was $80,650. From this figure respondent deducted petitioners' estimated living expenses for the same period ($53,500), and arrived at a figure of $27,150. Federal taxes paid during this 24-year period further reduced the amount of possible cash accumulation to $23,754.97. On the whole, the above-described method used by respondent's agent to estimate petitioners' possible cash accumulation from 1930 through 1953 was reasonable. Cf. Holland v. United States, 209 F. 2d 516 (C.A. 10, 1954), affirmed 348 U.S. 121 (1954). It must be remembered that respondent was obliged to resort to some reasonably effective method of income reconstruction in the absence of any records for the year 1954 and in *318 view of the fact that the books for 1957 through 1959 were not complete and were inaccurate. Respondent did not rely solely on this estimation, however. Rather he investigated to discover other possible cash sources, and found that petitioners had purchased eleven series E.U.S. savings bonds during the years 1944 through 1946 at a total cost of $8,250. On July 8, 1948, they cashed these bonds, receiving $8,560. During 1947 petitioners sold real property located on Brockley Road, Rochester, N. Y., for $10,500. In this same year, various business equipment was sold for $2,000. Petitioners purchased land and began construction of a house at 300 Clover Road, Rochester, N. Y., during 1948. On October 10, 1948, petitioners borrowed $18,000 from the Prudential Insurance Company giving back a first mortgage on the house as security. Petitioners sold this property for $39,000 on February 23, 1951. The purchaser of the property assumed the $16,212.66 still due on the loan. Respondent added the proceeds from these transactions to the possible cash accumulation figure of $23,754.97, previously computed from the information available from petitioners' tax records from 1930 through 1953. Thus, he *319 arrived at a figure of $68,000 which represented petitioners' total possible cash accumulation from 1930 through 1953. However, respondent did not give petitioners any credit for undeposited cash on hand as of January 1, 1954, the beginning of the tax period in question, because petitioners' other assets totaled $91,304.14 as of December 31, 1953, thereby indicating that any cash accumulation had been consumed by the purchase of assets or was deposited in petitioners' bank accounts. In order to accept this theory of "no undeposited cash on hand" as of January 1, 1954, we must be sure that the assets alleged to have consumed petitioners' cash were considered at cost as of December 31, 1953, and not at fair market value. The only item [15] *320 seriously alleged by petitioners not to be listed at cost was their residence at 100 Shaftsbury Road, Rochester, N. Y., which petitioner built in 1951. Respondent listed this residence at $40,000 in his opening net worth and carried this figure throughout the six years in question. This figure was the same figure that petitioners used on various financial statements submitted to bonding companies from 1952 to 1959. The amount was listed as the "forced sale value" of the residence on these statements. No records pertaining to the cost of the house were kept by petitioners. Petitioner testified that the actual cost of constructing the house was approximately $28,000 or $29,000. While respondent may have been justified in using the figure petitioners listed on the various financial statements as representing the asset value of the house, it does not follow that this figure represented the cost of constructing the house. However, the only evidence as to cost is the uncontradicted testimony of petitioner. We accept his testimony as to the cost of the house and find that respondent should have considered the residence at a cost of $28,500 in order to determine *321 whether petitioners' cash accumulation was consumed by the purchase of assets as of December 31, 1953. Having accepted petitioner's testimony as to the cost of the house, the cost of petitioners' assets as of December 31, 1953, totaled $79,804.14. Therefore, the $68,000 total possible cash accumulation of petitioners has still been consumed in other assets or was on deposit in petitioners' bank accounts as of January 1, 1954. 437 We note that respondent was justified in using $40,000 as the asset value of petitioners' residence. Since respondent listed the residence at $40,000 throughout the net worth reconstruction, petitioners have no ground to object to this valuation. 2. Garage Petitioners claim that respondent arbitrarily failed to list in the net worth statement for all the years in question a garage, located on Hebard Street, Rochester, N. Y., which had been given to petitioner by his father sometime prior to 1954. The garage was owned by petitioner throughout the years in question. This arbitrary deletion, petitioners argue, is fatal to respondent's net worth statement. While it is true that the value of this garage should have been included in respondent's computation of *322 petitioners' opening net worth and throughout the years in question, Holland v. United States, supra, the failure to do so does not deprive respondent's net worth statement for 1954 of its presumptive correctness. Harp v. Commissioner, 263 F. 2d 139 (C.A. 6, 1959). Respondent omitted the garage from the opening net worth and from the closing net worth as well. The garage was not disposed of by petitioner during the years in question. Therefore, there is no error in the final determination, although there is an error in the net worth statement. 3. Payroll Taxes Petitioners also allege that respondent failed to include a liability for year-end payroll taxes in his opening net worth statement and for the other years as well, and that this renders the net worth statement invalid. Upon cross examination, respondent's agent, Goldschmidt, testified that he was not aware that petitioner had any withholding tax liability at the end of each of the years in question. Agent Offen also testified that he was unaware of any employment tax liability. However, they both admitted that had there been such a liability, it should have been included in respondent's net worth statement. The failure to *323 include year-end payroll taxes as a liability as of December 31 of each of the years in question was not arbitrary. Agent Offen testified that he did not knowingly omit from the net worth any liability for employment taxes, and we have no reason to disbelieve him. No evidence was presented as to the number of persons which petitioner employed, nor as to the amount of payroll taxes that were withheld and owing the United States as of December 31 of each year in question. The evidence presented regarding these year-end payroll tax liabilities is so meager that we are not able to determine petitioner's liability for payroll taxes as of each year at issue. Respondent's failure to include any amount for payroll tax liability in his net worth reconstruction does not shift the burden of proof to respondent as to the other items in his net worth statement. It has long been recognized that the taxpayer has the burden of showing with respect to each item in the net worth reconstruction that the respondent was wrong. Anderson v. Commissioner, supra.
4. Personal Living Expenses Another item in the net worth statement prepared by respondent which petitioners contest is the amount of personal living *324 expenses which respondent added to petitioners' net worth. These nondeductible personal expenses must be added to the net worth increase for each year at issue since they represent additional income available to petitioners over and above the increases in net worth. Michael Potson, 22 T.C. 912 (1954), affd. sub nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956). As to the procedure for estimating the personal living expenses of petitioners, respondent's agents had been told by petitioner that the joint checking account at the Genesee Union Valley Trust Company was strictly personal in nature and that his wife handled that account. Petitioner's wife informed the agents that no canceled checks were available from that account since they had been destroyed, and that it was an account personal in nature. The agents obtained copies of the ledger sheets of this account, added the deposits made during each of the years in question to the opening balance for that year, and then subtracted the ending balance, thereby obtaining the total amount of checks written for each year at issue. The amounts determined to be drawn by this method were considered personal in view of what petitioners *325 had told the agents concerning the nature of the joint checking account. Respondent's agent also analyzed Brighton's three checking accounts at the Genesee Valley Union Trust Company, the Central Trust Company, and the Lincoln Rochester Trust Co. in order to determine the nature of its disbursements in 1957, 1958 and 1959. 438 Through discussion with petitioner's bookkeeper, the agent was able to determine whether the expenditure was personal or not. Any item listed as personal which related to the acquisition of an asset otherwise wise described in respondent's net worth was omitted from the agent's computation of petitioners' personal living expenses. No checks, however, were available for Brighton's accounts for the years 1954, 1955 and 1956. Confronted with a lack of records, respondent's agent estimated that certain amounts that were drawn on Brighton's accounts for 1954 through 1956 were for personal expenses. This was a reasonable assumption since over $32,000 in personal expenses were drawn on Brighton's accounts for the three years following 1957-1959. Respondent's agent took averages of the years 1957-1959 (approximately $10,500 per year) and estimated that $5,000 in personal *326 expenses were drawn from Brighton's accounts for 1954. These amounts were added to the amounts already determined to be personal from the Genesee Valley Union Trust Company. Petitioners claim that the figure for living expenses is too high because it contains duplications of personal expenditures that were made for the purchase of certain stock that was also listed as an asset in the net worth. If this contention were true, there would be a duplication as petitioners allege. However, respondent's agents testified that they attempted to trace withdrawals, wherever possible, from the joint personal account of petitioners at the Genesee ValleyUnion Trust Company for the very purpose of eliminating duplications. The only basis upon which petitioners rely to contradict the agents' testimony is the testimony of Robert Nicholson, a certified public accountant in the firm of Haskins & Sells. Since we give very little weight to the testimony of petitioners' two witnesses - Robert Nicholson and John Miceli, and since petitioners introduced no documented evidence to substantiate their claims of duplications, it is clear that they have not proved that the method used by respondent did not reasonably *327 reflect their personal living expenses. Therefore, the respondent's figures for personal living expenses are sustained. We feel that a discussion of the testimony of petitioners' two witnesses is warranted at this point. According to Nicholson's testimony, the firm of Haskins & Sells conducted an audit of petitioners and prepared a net worth statement for them. Robert Nicholson's role during the audit was that of supervisor. He did not personally examine bank records, records from the City of Rochester, brokerage house records, nor any other records allegedly examined to assist in the preparation of the net worth statement. The certified public accountant who conducted the actual audit for Haskins & Sells was not called upon to testify, nor were his audit work papers introduced into evidence. In view of the fact that Nicholson testified as to alleged facts of which he had no personal knowledge, we can give very little weight to his testimony regarding the investigation of bank, brokerage and other records, which investigation allegedly served as a foundation for the net worth statement prepared by the firm of Haskins & Sells. [16] *328 *329 *330 *331 *332 In order to reflect our conclusions reached herein, Decisions will be entered under Rule 50. 440 Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. 2. In respondent's deficiency letter, the following deficiencies were found with respect to petitioners' taxable years 1957, 1958 and 1959: Year
Deficiency
Addition to TaxSec. 6653(b)
1957
$13,367.76
$6,683.88
1958
10,997.16
5,498.58
1959
6,158.04
3,079.02
The parties have stipulated that the respondent, in using the net worth plus expenditures method of reconstructing petitioners' income, erroneously subtracted from such reconstruction for 1957, 1958 and 1959 the total amounts of $17,352.61, $21,777.59 and $5,973.09, respectively, as "technical adjustments." Because of this error, the statutory notice for said years understates the reconstructed income by such amounts, and therefore the additional income as shown in the statutory notice, and the deficiencies and additions to tax under sec. 6653(b)↩ for the taxable years 1957, 1958 and 1959 must be increased accordingly. By so agreeing, petitioners do not concede that they had any additional income for any of the years in question.
3. When we refer to Brighton's books or records, we are not implying that petitioner kept a general ledger. In fact, he did not, and we are cognizant of the fact that the bookkeeping method used to reflect Brighton's business transactions was quite informal.↩
4. Agent Goldschmidt did, nevertheless, have an opportunity to examine parts of the cash disbursements records for 1956, and noticed certain discrepancies between entries for 1956 and entries for later years.↩
5. It is interesting to note that agent Goldschmidt never saw any Brighton records for 1954 and 1955, although he did have the opportunity to examine parts of Brighton's 1956 cash disbursements records. During his routine audit for 1957 through 1959, Goldschmidt had no reason to inquire as to the availability of the records for 1954 and 1955. The only reason the 1956 records were available to him was due to the fact that the loose-leaf sheets on which the expenditures for 1956 had been listed happened to be in the same loose-leaf binder as the records for 1957 through 1959.↩
6. The parties' stipulation referred to sec. 7605(d), but this is obviously a typographical error. ↩
7. We are mindful of the fact that agent Goldschmidt did have access toBrighton's cash disbursements records for 1956 during the period in August 1960 that he was conducting a routine audit of petitioners' returns for the years 1957 through 1959, and, in fact, he noticed certain discrepancies therein. Upon returning to petitioner's office on August 30, 1960, with special agent Offen, Goldschmidt requested the same records he had examined previously, viz., the loose-leaf binder containing cash disbursements records for 1956 through 1959. It was at this time that the agents were informed that the records for 1956 had been destroyed. Since Goldschmidt had completed his routine audit approximately one week before he returned with agent Offen on August 30, 1960, it is evident that the records for 1956 must have been destroyed within this one-week period.
8. This amount allegedly represented the cost to petitioner of a job that had not been completed by the end of 1956, and for which petitioner had not yet billed the customer.
9. Petitioners' tax return for 1956 disclosed that $1,367.60 was deducted from petitioners' adjusted gross income rather than the amount of $1,574.75 which respondent indicated.
10. Respondent alleged that the amounts listed on his net worth statement for vehicles and equipment and for the reserve for depreciation were taken from petitioners' own tax returns. However, respondent's figures for the items footnoted are irreconcilable with petitioners' tax returns and, in view of the type of errors made, we are led to believe that an error was made in transposing the figures from petitioners' tax returns. The errors were slight and, for the most part, in petitioners' favor. The corrected amounts are as follows: Dec. 31
Vehicles and Equipment at Cost or Other Basis
Reserve for Depreciation
1957
$37,704.17
$19,543.23
1958
34,933.36 428 On January 16, 1954, petitioners opened a joint savings account, No. X1232On January 16, 1954, petitioners opened a joint savings account, No. X1232, in the First National Bank of Hollywood, Fla., which they closed on February 28, 1957. The balances in this account as of December 31 of the years 1954 through 1956 were as follows: Dec. 31
Balances
1954
$10
1955
10
1956
10 These balances were erroneously excluded from respondent's net worth reconstruction of petitioners' income. Petitioners engaged in certain financial transactions, which are pertinent herein but which are either not covered in the reconstruction tables or which require further comment. Petitioners rented a safe deposit box on November 13, 1944, from the Rochester Savings Bank, which they maintained continuously throughout the years at issue. On September 19, 1952, petitioner rented a safe deposit box from the Security Trust Company of Rochester, N. Y. Petitioner surrendered that box on October 6, 1953, in exchange for another safe deposit box which he maintained until December 11, 1958, at which time he surrendered the safe deposit box to the bank. Petitioners cashed eleven series EU.S. savings bonds on July 8, 1948, receiving a total of $8,560. They had purchased the bonds during the years 1944 through 1946 at a total cost of $8,250. During 1947, petitioners received $10,500 from the sale of real property located on Brockley Road, Rochester, N. Y., and $2,000 from the sale of various business equipment. Petitioner purchased land and started to build a house at 300 Clover Road, Rochester, N. Y., during 1948. He borrowed $18,000 from the Prudential Insurance Company on October 10, 1948, giving back a first mortgage on this house as security. On February 23, 1951, petitioner sold this property for $39,000. At that time, $16,212.66 was still due on the loan, and this was assumed by the purchaser of the property. During 1953 petitioner purchased a lot at the corner of Bay Street and Longview Terrace, Rochester, N. Y., for $3,855. In July 1956, he sold this lot for $5,500, of which petitioner received a total, after selling expenses, of $5,307.55 in two checks, one for $5,300 from the purchaser, Peter Mazzara, and the other for $7.55 from petitioner's attorney, Edward Provenzano. Petitioner deposited the $5,300 check in Brighton's checking account in the Genesee Valley Union Trust Company on July 23, 1956. Petitioner deposited the $7.55 check to his personal account in the Genesee Valley Union Trust Company on July 16, 1956. Petitioner invested $4,500 in 1954 in a restaurant and tavern of which he was the record owner, which investment he owned continuously throughout the years in question. Petitioner deducted a $2,194.26 loss with respect to this business on his 1954 income tax return. Neither income nor loss was reported from this business on subsequent returns for the years 1955 through 1959. In September 1954, petitioner received $16,578.49 for work performed on a project called the Mt. Hope City Job. In June 1954, he received $15,020.22 for work performed on a project known as Monticello Drive. Petitioner did not report either of these amounts on his 1954 income tax return. On December 20, 1955, the City of Rochester drew a check, No. 16804, on its account in the Security Trust Company in the amount of $25,848.49, payable to petitioner, which he cashed on January 4, 1956. Petitioner sold various equipment to the Spezio Construction Co., Inc., for $29,000 on October 28, 1955. The sale price was paid by check, as follows: Date
Spezio'sCheck No.
Amount
11- 1-55
4521
$ 5,000
11-15-55
Does not appear in record.
*↩
10,000
12-22-55
4976
3,000
2-17-56
5440
6,000
3- -56 *
- *
2,000
4- 5-56
5895
3,000
11. Petitioner testified regarding any possible nontaxable sources of income: Q. * * * [You] testified [that] you had $60,000 or $70,000 cash on hand. Was this all from your contracting business? A. Yes. Q. That is all income from the business; you didn't get it from any other source? A. Nosiree, I didn't. * * * Q. So, just in conclusion, you can't tell us how you accumulated all this money, can you? A. Just by working * * *. ↩
12. We note, however, that the record does convince us that Brighton was capable of generating the income reflected by the increases in net worth of petitioners.
13. See footnotes, 4, 5 and 7, supra.↩
*. The last digit was unclear. It was either a "7" or "8". In either event, neither check #3498 nor #3497 was in the amount claimed nor payable to the payee listed in the cash disbursements book.↩
14. Since we have already held that the years 1955 and 1956 are barred by the statute of limitations, our discussion will be limited to the remaining years in question - 1954, 1957, 1958 and 1959.↩
15. The only other contested asset - vehicles and equipment - was listed by respondent at the same cost petitioners used to list the equipment in order to schedule depreciation on their income tax returns for the years in question. Petitioners have presented no other evidence as to that cost, and we have already noted that they should not be heard to complain now of the very figures which they listed as the cost basis upon which depreciation for the vehicles and equipment was computed.
16. We note that respondent had access to the very records underlying the Haskins & Sells net worth statement. Yet respondent's agent who examined all pertinent records testified as to the results of their investigation. We see no reason why the accountant in Haskins & Sells who prepared the net worth statement did not testify as to the results of his investigation. John Miceli, an accountant, who has known petitioner since Miceli was about four years old, also testified in behalf of petitioners. Miceli prepared for petitioners a net worth statement and "a computation of additional taxable income" for the years 1954 through 1959. The only differences between respondent's net worth statement and Miceli's were those accounted for by the Haskins & Sells schedules and by a listing, given to Miceli by petitioner himself, of all known Brighton contracts and of the amounts of business receipts for the years in question. As we have already stated, we give little weight to the Haskins & Sells statement since we have not had the benefit of testimony from the certified public accountant who prepared it. Miceli testified that he used petitioner's books in compiling the "computation of additional income." He relied on the entries in the books without further investigation to verify the entries. Miceli testified that he "was primarily concerned with the totaling of those [expense] columns, with checking out cancelled checks that [he] 439 could find, and tracing them into the tax returns that were filed at that particular time. [He] was not so much concerned whether a repair should be capitalized or charged off * * *." Miceli assumed that petitioner's books for 1957-1959 were, on the whole, accurate, except for the duplicate recordings of checks discovered by respondent's agent, and he testified that his "computation of additional income" was predicated on the accuracy of petitioner's books. As for the years 1954-1956 for which there were no books, Miceli evidently accepted petitioner's account of jobs, contracts and receipts. In making his computations, Miceli disregarded firures shown on petitioners' tax returns and accepted other figures supplied by petitioner, which he did not try to verify. In view of the methods Miceli used in the compilation of the net worth reconstruction and the statement of "computation of additional income," we can give very little weight to his testimony and to the statements he prepared. With repect to the taxable years 1957 through 1959, petitioners stipulated, without agreeing that they had any additional income for any of those years, that respondent erroneously subtracted certain "technical adjustments" from his net worth reconstruction. In view of this stipulation, we do not feel that respondent must prove why these "technical adjustments" should not have been subtracted. Appropriate adjustments should be made to the net worth statements where warranted by our discussion above. Except for these adjustments, we accept respondent's determination of income for 1954, 1957, 1958 and 1959. There is one final matter. The addition to tax as determined under section 6653(b) has been incorrectly computed by respondent for 1954. This error is repeated for 1956; however, we have already held that year barred by the statute of limitations.
[17]Section 6653(b) states: (b) Fraud. - If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). Section 6653(c)(1) defines underpayment as follows: (1) Income, estate, and gift taxes. - In the case of a tax to which section 6211 (relating to income * * *) is applicable, a deficiency as defined in that section * * *. Section 6211(a) defines the term deficiency in the following manner: (a) In General. - For purposes of this title in the case of income, * * * imposed by subtitles A and B, the term "deficiency" means the amount by which the tax imposed by subtitles A or B exceeds the excess of - (1) the sum of (A) the amount shown as the tax by the taxpayer upon his return, if a return was made by the taxpayer and an amount was shown as the tax by the taxpayer thereon, plus (B) the amounts previously assessed (or collected without assessment) as a deficiency, over - (2) the amount of rebates, as defined in subsection (b)(2), made. We have already found that an earlier deficiency of $2,306.83 was assessed against petitioners for the years 1954 and was paid by them in November 1956. Under section 6211(a)(1)(B), the amounts previously assessed shall be added to the amount shown as the tax on a taxpayer's return for purposes of determining the amount of the deficiency, and thus underpayment to which the 50 percent penalty shall attach. Accordingly, the fraud penalty for 1954 should attach to the statutory deficiency of $12,338.98.